GRIFFIN, J.
 

 Crystal D. Charron [“Charron”] appeals the trial court’s order granting summary final judgment in favor of Warren A. Birge [“Birge”] and its subsequent order denying rehearing. We reverse.
 

 On February 20, 2008, William A. Smith [“Smith”]
 
 [1]
 
 and Charron sued Birge, alleging negligence in relation to a motor vehicle accident that occurred on U.S. Highway 17-92, at or near Seminole Boulevard at Lake Monroe in Sanford, Florida, on February 25, 2007. During discovery, depositions were taken of Smith, Charron, and Birge as well as of Justin Christie [“Christie”] and Albert C. Kirk, Jr. According to Smith, on February 25, 2007, around 4:00 p.m., he was driving his motorcycle on U.S. 17-92, and Charron was riding as a passenger. He stated that a car was traveling a “[p]retty good ways in front of [him]” as he rounded a curve
 
 *294
 
 alongside Lake Monroe. Smith explained that after looking down a crossover side road and ensuring that there was nobody coming, he looked up to find the car in front of him “stopped” or “just about stopped.” He was unable to avoid a collision, which caused the bike to flip and come to rest on top of Charron.
 

 According to Birge, at the time of the accident, he and his wife were traveling on highway 17-92 on their way to the zoo. The accident occurred at the juncture where W. Seminole Boulevard traffic yields into U.S. 17-92. Birge explained the events that transpired as follows:
 

 Q. [Pause] Okay. So you said you — you slowed down as you saw the black pickup approaching the yield sign?
 

 A. [Nods head affirmatively] Yes. We’re coming in like that [indicating]. And it looked to me as though we were bound for a collision because this merges into a single lane one-way. And I was being cautious and I stepped on the brake, I did not slam on the brake, I stepped on the brake to slow down.
 

 And as I did that he slowed down. Eventually he stopped at the sign. And I didn’t know at that point whether it was a yield sign or a stop sign. I didn’t know what his requirement was.
 

 So I slowed down still being cautious. Before I slowed down I looked in the rearview there was nothing in sight. Looked in the side view and there was nothing in sight.
 

 When I came up nearly abreast of him and by this time I’m doing probably ten miles an hour, the kid that was driving it was looking over.
 

 And I sort of waved him on because I thought maybe it was a stop sign and he had come to the stop sign and felt that he had the right to proceed again. That’s a very hairy intersection, by the way, and I had never been there in years.
 

 So anyway, I stepped on the gas again, pulled ahead. And as I, just about, as I passed the truck, the yield sign, I heard a thump on the left.
 

 I said: What the heck was that, to my wife?
 

 I pulled ahead a couple three car lengths probably until I could see something in the rearview and saw this motorcycle on the ground with two people on the ground also.
 

 Christie was the operator of the black pick-up that Birge saw approaching on W. Seminole Boulevard. Christie described the course of events as follows:
 

 Yeah, we had finished riding BMX. We had loaded the bikes up. I was heading home, and then we came to a yield sign. I looked over. There was a car coming, so we slowed down, and then a car just came to a standstill, liked slowed down and come to a complete stop and I heard something. It was a motor bike. And that’s it.
 

 When asked what caused him to notice the car, Christie responded: “Well, when I come to the yield sign, it’s obvious someone would look to see if there’s traffic coming, and I saw the ear coming so I slowed down. I don’t know what he did but he slowed down and come to a complete stop.” Also, when asked to describe the manner in which the car stopped, Christie explained:
 

 Well, the car, like, slowed down, and the next minute it came to a complete dead — just stopped completely, and that’s when I heard the motor bike hit it and then just saw two people fly over that.
 

 
 *295
 
 Christie confirmed that he had been “sitting at a complete stop” when the car “came to a complete stop.” He indicated that he didn’t see a reason for the driver to have stopped the car, explaining:
 

 He was the first one in the line. ‘I mean, there weren’t any cars in front of him. I mean, after the accident happened and that — I mean, I was still stationed there where I was at the yield sign. It’s not like if I was into the line that caused him to slam on brakes or anything.
 

 When asked whether he said anything to his passenger concerning the car coming to a stop, Christie answered: “Oh, we just looked at each other. I said to him, ‘What the hell’s the guy doing?’ You know, he’s got the right-of-way and he just come to a stop.” He estimated that the motorcycle had been approximately one and a half car lengths behind the car prior to the accident.
 

 When Smith was asked whether he was concerned about the traffic approaching at the intersection with W. Seminole Boulevard that caused Birge to stop, Smith responded: “There would be no reason to. They have a yield sign. There’s no reason to slow down there....”
 

 Birge filed a motion for summary judgment, asserting that a presumption of negligence attached to Smith as the following driver, that Charron failed to overcome the presumption, and, therefore, that Birge was not liable for the accident as a matter of law. Prior to the hearing on Birge’s motion for summary judgment, Charron filed an affidavit of Christie which provided in pertinent part:
 

 2.On February 25, 2007 at approximately 3:32 p.m., the Affiant witnessed an accident between an automobile, and a motorcycle which occurred on Seminole Boulevard and French Avenue
 
 [2]
 
 in Sanford, FL.
 

 3. I specifically observed the driver of what appeared to be a Buick proceeding north on French Avenue at a speed of approximately 30 to 35 miles per hour. I further noted that there is no stop sign or yield right of way sign for traffic at the intersection the driver of the automobile was approaching.
 

 4. For no apparent reason and to my complete surprise, the operator of the automobile abruptly slammed on his brakes and brought his vehicle to an abrupt stop as he was approaching the intersection described above.
 

 5. Unfortunately there was a motorcyclist with a passenger proceeding at a reasonable distance behind the subject automobile at or about the same speed the automobile operator had been traveling before he slammed on his brakes. It appeared that the motorcycle operator was caught totally by surprise because he suddenly attempted to veer and slow the motorcycle. The motorcycle flipped and threw both the operator and the passenger off and onto the roadway.
 

 On November 17, 2008, the trial court conducted a hearing on Birge’s motion for summary judgment, during which the trial court observed: “Well, there’s — under the laws of the State of Florida there’s a presumption that, I guess, the person in the rear is liable for the accident if the person in the front stopped.” Ultimately, the trial court granted the motion, stating:
 

 In the Clampitt
 
 [3]
 
 case the court says it appears — explains that the sudden stop standing alone is insufficient to overcome the presumption of negligence. It is not merely an abrupt stop, but if they perceive the vehicle if it is in its proper
 
 *296
 
 place on the highway that rebuts or dissipates the presumption that the negligence that the rear driver was the sole cause of the collision. It is a sudden stop by the preceding driver at the time and place where it could not reasonably be expected by the following driver that creates the factual issue. These cases seem to be clear. And in the Hunter
 
 [4]
 
 case each driver is charged under the laws to remain alert in following the vehicle in front of him or her at a safe distance.
 

 Anyway, I find that there’s no substantial — in looking at it in the light best suited for the plaintiff I’m going to grant the motion for summary judgment.
 

 Charron filed a motion for rehearing as well as an addendum to her motion. In her motion for rehearing, Charron argued: “It is axiomatic that unless it can be said without reasonable men differing that
 
 she
 
 was somehow the sole proximate cause of this accident or that the following driver was somehow the sole proximate cause of this accident, ... [she] should certainly be allowed to present her case to a jury of her peers. In all respects, she is without fault.” The trial court denied the motion.
 

 We previously discussed the origin and application of the presumption of negligence that attaches to the following driver in a rear-end collision in
 
 Jefferies v. Amery Leasing, Inc.,
 
 698 So.2d 368, 370-71 (Fla. 5th DCA 1997). We explained:
 

 The rear-end collision rule was recognized by Florida appellate courts in the second district case of
 
 McNulty v. Cusack,
 
 104 So.2d 785 (Fla. 2d DCA 1958), and was approved by the supreme court shortly thereafter in
 
 Bellere v. Madsen,
 
 114 So.2d 619 (Fla.1959). The usefulness of the rule is obvious. A plaintiff ordinarily bears the burden of proof of all four elements of negligence-duty of care, breach of that duty, causation and damages. Yet, obtaining proof of two of those elements, breach and causation, is difficult when a plaintiff driver who has been rear-ended knows that the defendant driver rear-ended him but usually does not know why. Beginning with
 
 McNulty,
 
 therefore, the law presumed that the driver of the rear vehicle was negligent unless that driver provided a substantial and reasonable explanation as to why he was not negligent, in which case the presumption would vanish and the case could go to the jury on its merits. At the time when this rear-end collision rule was developed, Florida was still a contributory negligence state. Thus, if the presumption were not overcome, the following driver’s claim would be barred. Under contributory negligence, a negligent plaintiff could not recover against a negligent defendant.
 

 Id.
 
 (citations omitted);
 
 see Clampitt v. D.J. Spencer Sales,
 
 786 So.2d 570, 573 (Fla.2001)(quoting Jefferies). We noted that Florida departed from the contributory negligence doctrine in 1973, and since then comparative negligence has allowed a jury to apportion liability between a negligent plaintiff and a negligent defendant.
 
 Jefferies,
 
 698 So.2d at 371. Ultimately, we concluded in
 
 Jefferies
 
 that:
 

 There is no logic in blindly applying the rear-end collision rule to determine the rear driver automatically to be the
 
 sole
 
 source of negligence in all rear-end collisions. If it is sufficiently demonstrated that the lead driver was negligent as well, the jury should pass upon the question of shared liability and apportionment of damages.
 

 Id.
 
 (emphasis in original). We also said:
 

 [I]n a case such as this
 
 where the only issue is the lead driver’s negligence, the presumption of the following driver’s negligence is not relevant.
 
 
 *297
 
 Under comparative negligence, the fact that a rear driver is presumed negligent because he cannot offer a substantial and reasonable explanation to the contrary should not operate to bar him from recovering proportional damages by establishing that the lead driver, too, was negligent.
 

 Id.
 
 at 372 (emphasis added). In
 
 Clampitt,
 
 the Florida Supreme Court said: “The rebuttable presumption of negligence that attaches to the rear driver in a rear-end collision in Florida cases arises out of necessity
 
 in cases where the lead driver sues the rear driver.
 
 The presumption bears only upon the causal negligence of the rear driver....” 786 So.2d at 572-73. (Emphasis added). The presumption exists to fill an evidentiary void for the lead driver; it does not exist to insulate a negligent lead driver from liability for his negligence. That is why the test is framed in terms of the
 
 rear
 
 driver’s conduct, i.e. whether the rear driver should have anticipated the lead driver might stop at the location, not whether it was reasonable for the lead driver to do so.
 

 The presumption clearly does not apply where a passenger of the following vehicle sues the lead driver for his negligence.
 
 [5]
 
 The issue in this case is whether Birge was negligent as the forward driver, not whether Smith’s presumed negligence as the following driver was rebutted. As explained in
 
 Jefferies,
 
 to the extent that there exists evidence sufficiently demonstrating that Birge was negligent as the forward driver, summary judgment against Charron is improper whether or not the presumption of Smith’s negligence as the following driver was rebutted. In turn, a failure to rebut the presumption of Smith’s negligence only leads to the determination that Smith was the sole proximate cause of the accident if there is no evidence to sufficiently demonstrate that Birge was negligent.
 
 See Servello & Sons, Inc. v. Sims,
 
 922 So.2d 234 (Fla. 5th DCA 2005)(where there is evidence that the lead driver’s negligence contributed to the collision, the presumption is rebutted and the issue is for the jury);
 
 Cleaveland v. Florida Power & Light, Inc.,
 
 895 So.2d 1143, 1145 (Fla. 4th DCA 2005)(the “rear end collision rule” did not bar a following driver’s claim where there was evidence of negligence on the part of the forward driver);
 
 Johnson v. Deep South Crane Rentals, Inc.,
 
 634 So.2d 1113, 1114 (Fla. 1st DCA 1994) (reiterating “that even where the rear vehicle driver may be negligent, the front vehicle driver is not necessarily free from negligence as a matter of law”).
 
 But see, Cevallos v. Rideout,
 
 18 So.3d 661 (Fla. 4th DCA 2009).
 
 [6]
 

 The record contains evidence that Birge suddenly stopped on U.S. 17-92 be-
 
 *298
 
 fore the juncture where W. Seminole Boulevard merges into U.S. 17-92 and merging traffic yields to vehicles traveling on 17-92. To the extent that Birge suddenly stopped, in deciding whether Birge was entitled to summary judgment, the inquiry is not whether Smith should have anticipated Birge’s sudden stop, but whether Birge’s sudden stop on 17-92 was negligent. Under one view of the evidence, Birge was negligent because, even though he had the right-of-way on a major thoroughfare, he suddenly stopped his car, erroneously believing Christie had the right-of-way, to the point that he even waved Christie on. There is no suggestion that Christie was not operating his vehicle correctly. Birge stopped because Christie reached the intersection as Birge reached the point of merger and Birge was not sure what was happening. But, if Birge wanted to stop until he was sure it was safe to proceed, or if he wanted to let Christie have the right-of-way, he had to do so in a way that would not place others in a zone of risk of harm. There is a difference between stopping for a reason and unnecessarily stopping for a reason.
 

 It was also error in this case to enter summary judgment under the facts on the issue of whether the rear driver should have anticipated the lead driver’s stop at the location where the accident happened. Charron and Birge discuss several cases that delve into the factual circumstances under which a sudden stop could not reasonably be expected. In
 
 Eppler v. Tarmac America, Inc.,
 
 752 So.2d 592, 595 (Fla.2000), the Florida Supreme Court found that it is not reasonable to expect a stop at an intersection in bumper-to-bumper traffic that is accelerating on a green light after having been stopped for a red light. The Court characterized the stop as both abrupt and arbitrary because there was evidence that the rear-ended driver “slammed on her brakes ‘for no reason.’ ”
 
 Id.
 
 at 595. However, prior to
 
 Eppler,
 
 the Third District Court of Appeal, in
 
 Tacher v. Asmus,
 
 743 So.2d 157, 158 (Fla. 3d DCA 1999), concluded “that a sudden stop by a preceding driver or drivers approaching or going through a busy intersection should be reasonably expected so as to impose a duty on the drivers which follow them to operate their vehicles
 
 *299
 
 at a safe distance.” The
 
 Eppler
 
 Court distinguished
 
 Tacher,
 
 stating: “Unlike the present case where [the following driver] testified repeatedly that [the rear-ended driver] slammed on her brakes ‘for no reason,’ the district court in
 
 Tacher
 
 noted no such misconduct....” 752 So.2d at 595. Subsequent to
 
 Eppler,
 
 in
 
 Clampitt,
 
 the Florida Supreme Court found that it is reasonable to expect a stop on a highway due to “accidents on the roadway ahead.” 786 So.2d at 575. The First District Court of Appeal, in
 
 Hunter v. Ward,
 
 812 So.2d 601, 603-04 (Fla. 1st DCA 2002), found that at a median crossing “a driver can reasonably expect vehicles traveling in the through lane to stop to allow a turning vehicle to clear the through lane.” Unfortunately, there is no discernable rule to be found in the cases; courts appear simply to engage in an ad hoc judgment about what the following driver should have anticipated.
 

 Here, the record contains testimony indicating that Birge and Christie were converging upon a juncture where W. Seminole Boulevard merges into U.S. 17-92, and that each was cognizant of the other. Normally, it would be hard to say that a driver could reasonably be expected to stop in the middle of a thoroughfare like highway 17-92 just because of the advent of an intersection or merging traffic, especially where the traffic entering is from a side road controlled by a plainly visible yield right-of-way sign and the intersection cannot fairly be characterized as “busy.”
 
 [7]
 
 Nevertheless, this is a stretch of road where, depending on the circumstances, a jury might conclude that a following driver should reasonably anticipate a sudden stop or near stop. Based upon the evidence, it would seem that the question whether Birge’s alleged sudden stop occurred at a time and place where a following driver should reasonably have anticipated a sudden stop is a question of fact.
 

 In sum, the issue properly framed is not whether any presumption of Smith’s negligence was rebutted, but whether there is record evidence that Birge was negligent as the forward driver and solely caused, or caused in connection with Smith, the injuries to Charron. The evidence could support a verdict for negligence on the part of Birge because there is evidence that he suddenly stopped in the middle of 17-92, that he did so unnecessarily, under the mistaken belief that Christie might have the right to proceed, and that he did so under circumstances where there was following traffic endangered by the unnecessary stop. Entry of summary final judgment in his favor was error.
 

 REVERSED and REMANDED.
 

 EVANDER and COHEN, JJ., concur.
 

 [1]
 

 . Smith later filed a notice of voluntary dismissal of his claim based on a settlement with Birge.
 

 [2]
 

 . Review of the record indicates that "French Avenue” refers to U.S. 17-92.
 

 [3]
 

 .
 
 Clampitt v. D.J. Spencer Sales,
 
 786 So.2d 570 (Fla.2001).
 

 [4]
 

 .
 
 Hunter v. Ward,
 
 812 So.2d 601 (Fla. 1st DCA 2002).
 

 [5]
 

 . Even under contributory negligence, a passenger in the rear vehicle was entitled to pursue all potential tortfeasors, including the forward drivers, in a rear-end collision. The presumption of negligence of the rear driver that is available to the lead driver does not affect the passenger’s right to recover.
 
 See Davis v. Sobik’s Sandwich Shops, Inc.,
 
 351 So.2d 17 (Fla.1977).
 

 [6]
 

 . Cevallos
 
 is different from this case because the plaintiff in that case was the following
 
 driver
 
 in a rear-end collision. The
 
 Cevallos
 
 court found that "public policy” mandated a rule that the following driver be deemed the sóle cause of the collision, notwithstanding that its proportional negligence might be minor. If the following driver cannot show the lead driver suddenly stopped at a location he could not anticipate, then the following driver will be deemed the sole cause of the accident, without regard to any negligence of the lead driver. The
 
 Cevallos
 
 court does not mention the
 
 Cleaveland
 
 decision from the same court, which appears to be contrary. We do not find in
 
 Clampitt
 
 that the presumption of the rear driver's negligence is a court-created rule in furtherance of some "public policy” against rear-end collisions. The
 
 Clampitt
 
 court did say that the following driver is "nor
 
 *298
 
 mally” the sole proximate cause of a rear-end collision, but that statement is dicta, likely from decisions that predated the adoption of comparative negligence.
 
 Clampitt
 
 was a suit by the lead driver and the question presented was whether evidence that the middle driver/plaintiff stopped suddenly and never applied her brakes before colliding with the vehicle in front of her was sufficient to overcome the presumption of negligence of the driver following her. The
 
 Clampitt
 
 court did not consider the issue of comparative negligence. Consider, for example, a lead driver is texting a cell phone message to his girlfriend with one hand, while tuning the car radio with the other, when he drops his phone into the cup of coffee between his legs and slams on the car’s brakes in shock and pain, with the result that he is struck by the following driver, who was unprepared for the sudden stop. The notion that the lead driver is immune from any liability because the collision happened to occur at a time and place where the following driver should have anticipated his stop makes no sense. If this is a rule based on public policy, it is odd that even drunk drivers get a better break than do following drivers.
 
 See
 
 768.36, Fla. Stat. (2009);
 
 Pearce v. Deschesne,
 
 932 So.2d 640 (Fla. 4th DCA 2006). As a matter of public policy, we want all drivers to obey
 
 all
 
 traffic laws, not just the prohibition against following too closely. We want drivers not to go the wrong way down a one-way street; we want the speed limits and traffic signals obeyed; we want headlights on after dark. (Presumably, we also want drivers not to make sudden stops for no good reason in the middle of the roadway.) In all these other instances, rules of comparative negligence apply. We do not believe the
 
 Clampitt
 
 court intended to create a rule eliminating comparative negligence uniquely for negligent following drivers. Even if the
 
 Cevallos
 
 court is right, however, the presumption still would have no application to an injured third party.
 

 [7]
 

 . The trial court's only expressed evaluation of the "time and place where [a stop] could not reasonably be expected” test was to opine generally that a merging intersection is even more dangerous than a normal intersection.